**Frank T. SHUM, Plaintiff,**

v.

**INTEL CORP., et al., Defendants.**

**No. C–02–3262–DLJ.**

United States District Court,
N.D. California.

April 29, 2009.

---

1064

E. Robert Wallach, Law Offices of E. Robert Bob Wallach, Paul F. Kirsch, Angus M. MacDonald, Mark T. Jansen, Robert Allan McFarlane, Tali Leah N. Alban, Townsend and Townsend and Crew LLP, Christofer Charles Nolan, Carlson Calladine & Peterson LLP, San Francisco, CA, Alan L. Barry, Bell, Boyd & Lloyd, Chicago, IL, Harris Zimmerman, Law Offices Of Harris Zimmerman, Oakland, CA, for Plaintiff.

Robert Addy Vannest, Daniel E. Jackson, Daniel Edward Purcell, Keker & Van Nest, Stephen E. Taylor, Jayesh Sanatkumar Hines–Shah, Jessica L. Grant, Jona-

than Alan Patchen, Stephen McGeorge Bundy, Taylor & Company Law Offices, LLP, San Francisco, CA, for Defendants.

### ORDER

D. LOWELL JENSEN, District Judge.

On February 20, 2009, the Court heard oral argument on Defendants' renewed motions for judgment as a matter of law (JMOL). Having considered the papers submitted, the arguments of counsel, and the applicable law, the Court hereby GRANTS Defendants' renewed motion for JMOL as to Shum's state law claims, and GRANTS in part and DENIES in part Defendants' renewed motion for JMOL as to inventorship.

### I. BACKGROUND

#### A. Factual Background

Plaintiff Frank Shum (Shum) and defendant Jean–Marc Verdiell (Verdiell) are optical engineers. They met in 1994 when both worked at a company called SDL Technologies (SDL).

After leaving SDL, Shum and Verdiell incorporated Radiance Design, Inc. (Radiance) on April 22, 1999, intending to work in the field of optoelectronics. Shum and Verdiell were the sole and equal shareholders, with Verdiell as President and Treasurer and Shum as Vice President and Secretary. On the day of incorporation, a patent application related to optoelectronic technology was filed on behalf of Radiance. Marek Alboszta (Alboszta), a patent agent, had been hired by Radiance and prepared this patent application, which named Shum as the sole inventor.

While the patent application filed in April was pending, Verdiell informed Alboszta that he was also an inventor of the subject matter covered by the patent. Shum states that Alboszta informed him of this new information from Verdiell and stated, to Shum, that if Verdiell is an inventor, the application must be withdrawn. Verdiell also told Shum that the patent application would have to be withdrawn. Subsequently, Radiance withdrew the pending application on November 17, 1997.

At about this time, the relationship between Shum and Verdiell deteriorated. Both Shum and Verdiell hired individual counsel to negotiate the dissolution of Radiance and a Plan of Liquidation (POL) was drafted. The POL was agreed upon and executed on January 5, 1998. Radiance was dissolved as of that date.

After Radiance was dissolved, Shum formed a new company called Luminance in order to continue developing the technology that he and Verdiell worked on at Radiance. Shum failed to obtain financing for Luminance, however, and he abandoned the company after several months. Thereafter, Shum accepted employment as an optical engineer at a telecommunications company named Ditech.

The day after the POL took effect, Alboszta filed a patent application on Verdiell's behalf which related to optoelectronic technology covering the same subject matter as the withdrawn patent application. This patent application named Verdiell as the sole inventor. The patent application was assigned to LightLogic, a company newly formed by Verdiell. Verdiell had formed LightLogic, without notice to Shum, three days before the original patent application was withdrawn in November 1997. Based on this application, United States Patent No. 5,977,567 ('567) was ultimately issued on November 2, 1999, listing Verdiell as the sole inventor.

Over the next several years, LightLogic applied for and obtained six additional patents: United States Patent Nos. 6,376,268 ('268); 6,207,950 ('950); 6,586,726 ('6726); 6,227,724 ('724); 6,585,427 ('427); and 6,252,726 ('2726). All of these patents

named Verdiell as the sole inventor except the '427 patent, which named Verdiell as well as four co-inventors. None of the patents listed Shum as an inventor.

These seven patents cover three separate areas of optoelectronic technology. The first area can be referred to as "Dual Enclosure" technology and involves only a single patent—the '2726 patent. This invention describes an optoelectronic package which is comprised of two separate enclosures designed to regulate the temperature within the package in a cost-efficient manner. The second technology group is referred to by the parties as "Direct Bonded Copper" (DBC) or "Step" technology and two patents, '567 and '268, are involved. These patents disclose an optoelectronic package consisting of a substrate made of an insulating ceramic material, and a layer of copper that is bonded to this substrate. The third technology group is called "Flexure" technology and four patents, '950, '724, '427, and '6726, are involved. These inventions address the problem of precisely aligning a laser diode and an optical fiber during an automated fiber-optic assembly process, and of keeping the two components aligned during use.

After LightLogic was formed, Verdiell undertook extensive efforts to develop and market a device known as a transponder. A transponder is an optoelectronic device that takes in electrical signals and converts them into optical signals, enabling telecommunications providers to process a large volume of data at a very high speed. Transponders contain numerous electrical and optical components, including an optical receiver, a high speed amplifier, a high speed demultiplexer, a multiplexer driver, and an optical transmitter.

In order to develop and market a transponder, Verdiell hired a team of managers and engineers to work at LightLogic. After three rounds of venture capital investment and approximately three years of effort, LightLogic began the manufacture and sale of transponders in 2000. All of LightLogic's transponders at that time used off-the-shelf optical components rather than any optical technology based on Verdiell's patents.

In June 2001, Intel acquired LightLogic, its physical assets and the services of its personnel, along with the rights to Light-Logic's transponder, the '567 patent, and the six additional patents issued to Light-Logic, for $409 million in shares of its stock. LightLogic distributed these shares directly to its shareholders. Verd-iell received $58.4 million from the transaction. After Intel acquired LightLogic, Intel began manufacturing transponders which contained different optoelectronic components, including the patented flexure, which had been developed at Radiance.

Shum contends that he is an inventor of the technology claimed by the seven patents issued to Verdiell.

**B. Procedural History**

In 2001, Shum filed his original complaint in this action in California state court against Intel, Verdiell, Alboszta, Lumen (Alboszta's patent firm), and John Gorman (Verdiell's attorney during the dissolution of Radiance). The complaint contained numerous state causes of action, essentially based on claims of fraud.

On July 9, 2002, Intel removed the case to federal district court.

On December 19, 2002, Shum filed a second amended complaint in this Court. This complaint essentially repleaded the original state causes of action and added a federal cause of action for correction of patent inventorship pursuant to 35 U.S.C. § 256. The second amended complaint also added LightLogic as a defendant.

On January 21, 2003, Intel and Verdiell filed a motion to dismiss the second amended complaint. This Court entered an order on March 25, 2003, granting in part and denying in part Defendants' motion to dismiss. Among the dismissed claims was a claim under California state law for unjust enrichment. The Court dismissed this claim on the basis that it was duplicative of the causes of action for fraud.

On April 27, 2004, the Court issued an order as to the third amended complaint denying Defendants' summary judgment motions, recognizing that all of Shum's state law causes of action were primarily based on the unresolved allegation that Verdiell was not the sole true inventor of the patented technology. After a hearing on the matter, the Court decided to bifurcate the inventorship issues from the other claims of the complaint, and ordered that the § 256 inventorship trial should proceed first.

In addition, the Court interpreted two provisions of the POL. First, the Court interpreted the section entitled "Business Activities of Officers and Directors." This provision states:

> Shum and Verdiell acknowledge and agree that, after the approval of this Plan, each of them shall be entitled, without any liability or duty to account to [Radiance] or to the other, to pursue any and all such other business activities as they shall desire, even if such activities are in competition with the business of [Radiance] and even if they take, or attempt to take, a business opportunity that [Radiance] could have itself pursued.

The Court interpreted this provision to eliminate any liability between Shum and Verdiell based upon the conduct of "business activities" by Shum or Verdiell in any commercial exploitation of the Radiance technologies, and to allow them to compete with each other without notice to each other or any accounting as to profits. The Court also interpreted this provision to eliminate any liability between Shum and Verdiell based solely on either party obtaining a lawful patent related to the intellectual property developed at Radiance.

Second, the Court interpreted the section of the POL entitled "Distribution of Property." Subsection (iii) of that section provides, in pertinent part:

> Verdiell and Shum shall have equal rights to independently exploit the intellectual property developed by [Radiance].

The Court interpreted this provision to mean that Shum and Verdiell were entitled to lawfully patent any of their own inventions contained in the intellectual property which had previously been the property of Radiance.

From January 10, 2005 to January 24, 2005, the Court conducted a § 256 bench trial, at which Shum contended that there should be a correction of inventorship as to multiple claims of each of the seven patents. An order setting forth the Court's findings of fact and conclusions of law was issued on June 21, 2005. The Court concluded that Shum did not meet his burden to show that he was the inventor or co-inventor of any of the patent claims at issue and denied any correction of inventorship.

On January 12, 2006, the Court issued an order as to a fourth amended complaint granting Defendants' summary judgment motions, concluding inter alia that, in light of the Court's findings that Shum was not an inventor of any of the claims of the patents at issue, a jury could not reasonably find for Shum on any of the state law causes of action.

Shum appealed, and on November 19, 2007, the United States Court of Appeals for the Federal Circuit reversed the inven-

torship ruling of June 21, 2005 as well as the January 12, 2006, summary judgment ruling. The Federal Circuit held that, because the issue of inventorship was integral to, and "inextricably intertwined" with, the factual basis of the state law claims, it had to be first presented to and decided by a jury pursuant to the Seventh Amendment. The Court of Appeals additionally reversed the Court's March 25, 2003, dismissal of Shum's unjust enrichment claim, holding that under California law the unjust enrichment claim constituted a separate cause of action, not duplicative of the other causes of action. The relevant previous orders were vacated and the case was remanded to this Court.

On September 26, 2008, 2008 WL 4414722, the Court issued a second order as to Shum's fourth amended complaint, this time granting Defendants' motion for summary judgment in part and denying it in part. The Court ruled, among other things, that Verdiell did not owe any fiduciary duty to Shum, and as a result, that no liability could arise in this case based on the fact that Verdiell did not disclose something to Shum.

On November 13, 2008, pursuant to the mandate of the Federal Circuit, the Court empaneled a jury to hear Shum's claims for correction of inventorship, intentional misrepresentation, breach of contract, and unjust enrichment. The case was tried to the jury.

By the close of evidence, several new developments had altered the landscape of the case. First, Shum withdrew his claim for correction of inventorship as to the '2726 patent. Second, Shum abandoned any claim to sole inventorship of any of the six remaining patents, conceding, in effect, that Verdiell was at least a co-inventor of every patent-in-suit. Third, Shum disclaimed any basis for liability against Intel other than its status as LightLogic's successor-in-interest. Fourth, Shum specified

which alleged misrepresentations were the basis of his intentional misrepresentation claim. According to Shum, Verdiell's alleged fraud arose solely out of Verdiell's and Alboszta's representations that the original step patent application was invalid and had to be withdrawn.

On December 22, 2008, the jury returned verdicts on some of Shum's claims and reported that it could not reach a verdict on the others. The jury was unable to reach a verdict on any of the state law claims. The Court declared a mistrial as to each of these claims.

The jury returned the following verdicts on inventorship claims:

- U.S. Patent No. 5,977,567: Shum is a co-inventor of six claims of the patent.

- U.S. Patent No. 6,376,268: Shum is a co-inventor of five claims of the patent.

- U.S. Patent No. 6,207,950: Shum is a co-inventor of four claims of the patent.

- U.S. Patent No. 6,586,726: Shum is a co-inventor of four claims of the patent.

- U.S. Patent No. 6,227,724: Shum is a co-inventor of four claims of the patent. The jury was deadlocked as to claim five of the patent and the Court declared a mistrial as to this claim.

- U.S. Patent No. 6,585,427: Shum was not a co-inventor of three claims of the patent. The jury deadlocked as to claim one of the patent and the Court declared a mistrial as to this claim.

Following trial, Defendants filed the instant renewed motions for JMOL regarding Shum's state law and inventorship claims.

A more detailed description of the history of this case is contained in the previous orders of this Court.

## C. Legal Standards

### 1. Judgment as a Matter of Law

Federal Rule of Civil Procedure 50(a) provides:

If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Rule 50(b), which provides for renewing a motion for judgment as a matter of law, states:

If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. . . . In ruling on the renewed motion, the court may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law.

■ Where the jury has reached a verdict, the court must ask whether, construing the evidence in the light most favorable to the nonmoving party, the jury's verdict was supported by "substantial evidence." *Fisher v. City of San Jose*, 558 F.3d 1069, 1074 (9th Cir.2009). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

■ Where the jury has not reached a verdict, the failure to reach a verdict "does not necessarily preclude a judgment as a matter of law." *Headwaters Forest Def. v. County of Humboldt*, 240 F.3d 1185, 1197 (9th Cir.2000) (*vacated on other grounds*

by *County of Humboldt v. Headwaters Forest Def.*, 534 U.S. 801, 122 S.Ct. 24, 151 L.Ed.2d 1 (2001)). "The test is whether the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion." *White v. Ford Motor Co.*, 312 F.3d 998, 1010 (9th Cir.2002) (quotation omitted).

■ In evaluating the evidence presented at trial, the court must not substitute its own view of the evidence for that of the jury. *Fisher*, 558 F.3d at 1074. Nor may the court make credibility determinations or weigh the evidence. *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir.2001).

### 2. Intentional Misrepresentation

■ Under California law, the elements of intentional misrepresentation are as follows: (1) the defendant represented to the plaintiff that an important fact was true; (2) that representation was false; (3) the defendant knew that the representation was false when the defendant made it, or the defendant made the representation recklessly and without regard for its truth; (4) the defendant intended that the plaintiff rely on the representation; (5) the plaintiff reasonably relied on the representation; (6) the plaintiff was harmed; and (7) the plaintiff's reliance on the defendant's representation was a substantial factor in causing that harm to the plaintiff. *Manderville v. PCG & S Group, Inc.*, 146 Cal.App.4th 1486, 1498, 55 Cal.Rptr.3d 59 (2007).

### 3. Breach of Contract

■ In California, the elements of breach of contract are: (1) the contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) damage to plaintiff therefrom. *Wall Street Network, Ltd. v. New York*

*Times Co.,* 164 Cal.App.4th 1171, 1178, 80 Cal.Rptr.3d 6 (2008).

### 4. Unjust Enrichment

 Under California law, the elements of unjust enrichment are: (1) receipt of a benefit; and (2) the unjust retention of the benefit at the expense of another. *Peterson v. Cellco P'ship,* 164 Cal.App.4th 1583, 1593, 80 Cal.Rptr.3d 316 (2008). The mere fact that a person obtains a benefit from another is not of itself sufficient to require that person to make restitution therefor. *Cal. Med. Ass'n, Inc. v. Aetna U.S. Healthcare of Cal., Inc.,* 94 Cal.App.4th 151, 171 n. 23, 114 Cal. Rptr.2d 109 (2001). Thus, even when a party has received a benefit from another, it is required to make restitution only if the circumstances of its receipt or retention are such that, as between the two parties, the retention of the benefit is unjust. *Id.* This requires wrongful conduct on the part of the party receiving the benefit. *See County of San Bernardino v. Walsh,* 158 Cal.App.4th 533, 542–43, 69 Cal.Rptr.3d 848 (2007). As a matter of law, an action for unjust enrichment does not lie where an express binding agreement exists and defines the parties' rights. *Cal. Med. Ass'n,* 94 Cal.App.4th at 172, 114 Cal.Rptr.2d 109.

### 5. Correction of Patent Inventorship

 A patent is invalid if more or less than the true inventors are named. *Jamesbury Corp. v. United States,* 207 Ct.Cl. 516, 518 F.2d 1384, 1395 (1975). Because a patent is presumed to be valid, there is a parallel presumption that the named inventors on a patent are the true and only inventors. *Univ. of Colo. Found., Inc. v. Am. Cyanamid Co.,* 342 F.3d 1298, 1308 (Fed.Cir.2003). As a result, a party seeking to change the existing inventorship has a burden to prove by clear and convincing evidence the existence of an inventorship contribution to any of the patent claims. *Bd. of Educ. v. Am. Bioscience, Inc.,* 333 F.3d 1330, 1337 (Fed.Cir. 2003).

 Conception is the "touchstone" of inventorship. *Am. Cyanamid,* 342 F.3d at 1308. To be a joint inventor, one must "(1) contribute in some significant manner to the conception or reduction to practice of the invention, (2) make a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention, and (3) do more than merely explain to the real inventors well-known concepts and/or the current state of the art." *Pannu v. Iolab Corp.,* 155 F.3d 1344, 1351 (Fed.Cir.1998). A purported co-inventor does not satisfy this standard by contributing an element which is obvious or exists in the prior art. *Nartron Corp. v. Schukra U.S.A., Inc.,* 558 F.3d 1352, 1356–58 (Fed.Cir.2009).

 To meet the clear and convincing burden of proof, alleged co-inventors must prove their contribution to the conception with more than their own testimony respecting the facts surrounding a claim of inventorship. *Price v. Symsek,* 988 F.2d 1187, 1194 (Fed.Cir.1993). Relevant corroborating evidence generally takes the form of physical evidence, or oral testimony of someone other than the alleged inventor. *Trovan, Ltd. v. Sokymat SA, Irori,* 299 F.3d 1292, 1302–03 (Fed.Cir.2002).

 The inventorship of a patent or patent application may be corrected to name another actual inventor if the omission of that unnamed inventor occurred without deceptive intent on the part of the unnamed inventor. *See* 35 U.S.C. §§ 256, 116. A patent is unenforceable and is invalid and uncorrectable if it was obtained with deceptive intent on the part of the applicant. *See PerSeptive Biosystems,*

*Inc. v. Pharmacia Biotech, Inc.*, 225 F.3d 1315, 1322–23 (Fed.Cir.2000).

## II. DISCUSSION

### A. Intentional Misrepresentation

■■■ For the following reasons, Shum has failed as a matter of law to prove that Defendants committed the tort of intentional misrepresentation.

#### 1. False Statement

First, Shum has not presented sufficient evidence to support a factual conclusion that Defendants made a false statement. Under the evidence presented in this case and the law of patent inventorship, Verdiell's and Alboszta's statements that the original step patent application was invalid and had to be withdrawn, are not shown to be false. When a patent application omits an actual co-inventor with deceptive intent on the part of the unnamed inventor, that application is invalid and must be withdrawn. *See* 35 U.S.C. § 116.

At the trial, Verdiell testified that his name was left off the original patent application because his work on the invention was done at Radiance while he was still employed by SDL, and that fact might cause problems as to ownership of the patent. There was no evidence at the trial to show that this state of mind did not exist.

Verdiell also testified at the trial that before the LightLogic patent application was filed following the dissolution of Radiance, he had gone over the original patent application and removed anything in the abandoned application that was based on Shum's work at Radiance. In this case,

Shum does not dispute that Verdiell is an actual co-inventor of every patent-in-suit, which would include the subject matter of the '567 patent which had originally been part of the abandoned patent application. Once Verdiell notified Shum that he was a co-inventor, the patent application listing Shum as the sole inventor could not have remained in the hands of the PTO without deceptive intent on the part of Verdiell. Such deceptive intent on the part of the unnamed inventor, Verdiell, would have rendered the application invalid and uncorrectable under § 116. Accordingly, when Verdiell and Alboszta informed Shum that the patent application was invalid and had to be withdrawn, they were correct—the statements were not false.[1]

#### 2. Reliance

■■■ Even assuming that Verdiell made a false statement, Shum has failed to present any evidence from which a reasonable juror could conclude that he relied on any such statement. Shum's only evidence of reliance is his testimony that, had he known Verdiell was preparing a sole inventor application, he would never have agreed to enter into the POL. *See* Trial Tr. vol. 3, 593:25–594:20, Nov. 18, 2008.

■■■ This testimony fails to establish reliance. A duty to disclose only arises between two parties if a fiduciary or confidential relationship exists between them, or if there are other special circumstances which would require a disclosure. *See Warner Constr. Corp. v. Los Angeles*, 2 Cal.3d 285, 294, 85 Cal.Rptr. 444, 466 P.2d 996 (1970). This Court has already ruled that Verdiell owed no such duty to Shum.

---

1. In his opposition brief, Shum asserts, for the first time, that there was an additional allegedly false statement by Verdiell: that Verdiell promised Shum he would re-file a patent application that listed both of them as inventors after the first application was withdrawn. There is a significant question as to whether there is evidence to support this assertion, but it is not necessary to review the evidence, as this statement cannot support a finding of intentional misrepresentation because it was not submitted to the jury and there was no request by Shum to do so. *See* Trial Tr. vol. 19, 4021:16–21, Dec. 17, 2008.

*See* Sept. 26, 2008 Order at 14:23–20:11. Consistent with this ruling, the Court instructed the jury that liability for intentional misrepresentation could not be based on a non-disclosure by Verdiell. *See* Trial Tr. vol. 19, 4022:13–16, Dec. 17, 2008. Because Shum's purported reliance in this case is premised solely on the fact that Verdiell omitted to tell him about the sole inventor application, no reasonable juror could have concluded that Shum relied on such a failure to disclose.

Shum also contends that Verdiell's trial testimony establishes that his reliance was induced. Specifically, Shum concludes from Verdiell's testimony that Verdiell believed the abandonment of the original patent application was "not just a substantial factor in, but a necessary predicate to, entry into the POL." Shum's Opp. at 6:22–23. Shum appears to contend that if Verdiell held this belief, then Verdiell's statement that the application had to be withdrawn must have induced Shum to enter into the POL.

This argument misconstrues the nature of causation. The relevant causation inquiry in this case pertains to Shum's motivations for entering into the POL. The inference Shum draws from Verdiell's testimony relates to Verdiell's state of mind, not Shum's. Absent any evidence establishing a causal connection between Verdiell's alleged misrepresentations and Shum's motivations for executing the POL, no reasonable juror could conclude that Verdiell fraudulently induced Shum to enter into the POL.

**3. Harm**

 Finally, Shum has failed to present any evidence that he suffered legally cognizable harm as a result of Verdiell's alleged misrepresentation. Shum's theory of intentional misrepresentation damages is that after the POL was executed, Verdiell used the agreement to deprive Shum of his rights to the Radiance technology. Shum's damages expert, Paul Regan, valued Shum's loss attributable to this alleged fraud at $29.2 million, or one-half the value of the Intel shares Verdiell acquired as a result of the Intel–LightLogic merger. *See* Trial Tr. vol. 12, 2529:7–2530:6, Dec. 4, 2008.

 Under California law, Shum must have incurred actual monetary loss as a result of Defendants' alleged fraud. *See* Cal. Civ.Code § 3333; *Strebel v. Brenlar Invs., Inc.,* 135 Cal.App.4th 740, 749, 37 Cal.Rptr.3d 699 (2006). Shum has failed to present evidence of any such loss. Shum's theory of fraud damages rests on the conclusory assertion that, had he not been fraudulently induced into entering into the POL, he would now possess $29.2 million. This assertion is based on several unfounded assumptions regarding what would have happened to Shum, Verdiell and Radiance, had the POL never been executed. Such assumptions include, for example, that Shum would have (1) been a co-participant in Radiance or LightLogic along with Verdiell; (2) obtained patents on the Radiance technologies; and (3) been an equal owner of the Intel shares distributed to Verdiell at the time of the sale. All of the evidence presented at trial, however, suggests the opposite. *See, e.g.,* Trial Tr. vol. 3, 607:7–25, Nov. 18, 2008 (Shum abandoned his own efforts to develop the Radiance intellectual property after Radiance dissolved); *id.* vol. 4, 810:10–814:24, Nov. 19, 2008 (the relationship between Verdiell and Shum had irrevocably deteriorated); *id.,* 826:17–831:19 (same).

 Absent any evidence of actual loss, Shum's theory of fraud damages amounts to little more than an unjust enrichment claim. Unjust enrichment cannot serve as a basis for fraud damages. *See, e.g., Ward v. Taggart,* 51 Cal.2d 736,

741–42, 336 P.2d 534 (1959). Shum has failed as a matter of law to demonstrate that he suffered direct harm as a result of Verdiell's alleged intentional misrepresentation.

### B. Breach of Contract

Shum has also failed as a matter of law to prove the elements of breach of contract.

#### 1. Breach

First, Shum has presented no evidence that Verdiell breached the POL. Under the Court's interpretation of the POL, Verdiell is only liable to Shum for breach of contract if he obtained a patent for the Radiance technology which is not lawful. *See* Trial Tr. vol. 19, 4025:9–4026:2, Dec. 17, 2008.

Shum contends that Verdiell engaged in unlawful conduct by acquiring patents which omitted Shum as a co-inventor. As noted, the omission of a co-inventor only amounts to unlawful conduct if the patent is obtained by deceptively concealing the existence of the omitted co-inventor. *See PerSeptive*, 225 F.3d at 1322–23. As already noted, Shum has conceded that Verdiell is in fact an inventor of each of the seven patents at issue in this case. As a result, the fact that Verdiell has obtained these patents in his own name is not unlawful conduct in and of itself. If, however, Shum was a co-inventor of each of these patents and the conduct of Verdiell in naming himself as the *sole* inventor of the patent was accomplished by deceptive intent on his part, the patents would be unlawful. In order to prove unlawfulness in such circumstances, Shum would have to prove inequitable conduct before the PTO by proof that (1) Shum was an actual co-inventor of the patent; (2) Verdiell knew that Shum was a co-inventor; and (3) Verdiell omitted Shum's name as a co-inventor because he intended to mislead the PTO as to the true inventorship of the patent. On five of the patents the jury found that Shum was a co-inventor, but no evidence was introduced that would provide evidentiary support for factual findings that Verdiell knew that Shum was a co-inventor and that he omitted Shum's name from the patents with the intent to mislead the PTO.

Lacking any such evidence, Shum raises three legal arguments in support of his breach of contract claim. First, Shum contends that the Court may not consider the question of deceptive intent because any such consideration erroneously introduces a deceptive intent element into Shum's breach of contract cause of action. This argument is frivolous. Although it is true that a contract may be breached without any proof of deceptive intent, in this particular context, the conduct itself which is asserted to be a breach, can be a breach only if it is accompanied by deceptive intent. The Court instructed the jury that Shum must prove the four elements of breach of contract described above. *See* Trial Tr. vol. 19, 4024:16–24, Dec. 17, 2008. The Court does not believe that adding to or altering these instructions would have been appropriate.

Second, Shum argues that the question of intent is a factual question which must be decided by the jury rather than the Court. This argument also lacks merit. In ruling on the instant motion, the Court must determine whether Shum has presented sufficient evidence for a reasonable jury to find in his favor. *See White*, 312 F.3d at 1010. Determination of this question does not invade the province of the jury.

Third, Shum argues that the Court should prohibit Defendants from raising the issue of deceptive intent in the instant motion because they did not raise the issue in their original motion for JMOL. This argument misconstrues Defendants' Rule

50(a) motion. *See* Def. Mot. for JMOL at 7:2–7.

Accordingly, Shum has failed to present sufficient evidence from which a reasonable juror could conclude that Verdiell breached the POL.

### 2. Harm

 Second, Shum has failed to present any evidence from which a reasonable jury could conclude that Shum suffered harm as a result of Verdiell's alleged breach. Shum's theory of contract damages is that Verdiell failed to buy out Shum's rights to the Radiance intellectual property before Verdiell obtained his patents, secured venture capital for LightLogic, and sold LightLogic to Intel.

 Under California law, a "breach of contract is not actionable without damage." *Bramalea Cal., Inc. v. Reliable Interiors, Inc.*, 119 Cal.App.4th 468, 473, 14 Cal.Rptr.3d 302 (2004). The "breaching party is only liable to place the non-breaching party in the same position as if the specific breach had not occurred." *St. Paul Fire and Marine Ins. Co. v. Am. Dynasty Surplus Lines Ins. Co.*, 101 Cal. App.4th 1038, 1061, 124 Cal.Rptr.2d 818 (2002).

 Shum has made no showing that Verdiell's failure to buy out his rights amounts to a pecuniary loss on the part of Shum. Verdiell had no duty to buy out Shum, and the only theoretical damage Shum could have incurred as a result of Verdiell's alleged unlawful patenting would have occurred if Verdiell's conduct frustrated some lawful effort on the part of Shum to acquire patents covering the same subject matter. Under such circumstances, Verdiell's conduct could have interfered with Shum's co-equal right under the POL to commercially exploit his patented Radiance intellectual property, and as a result, Shum could have lost profits from the interference with his ability to exploit this property. Lost profits are a recognized measure of damages for breach of contract. *See, e.g., St. Paul Fire and Marine*, 101 Cal.App.4th at 1061, 124 Cal. Rptr.2d 818.

Shum has presented no evidence of any such detriment. To the contrary, Shum admitted at trial that he abandoned Luminance, his own post-Radiance startup company, in order to obtain the security of working for an established telecommunications company. *See, e.g.,* Trial Tr. vol. 3, 607:8–608:5, Nov. 18, 2008. As a result, Shum has failed to provide any basis for the jury to conclude that he is not already in the same financial position he would have been in had the alleged breach never occurred. *See St. Paul Fire and Marine*, 101 Cal.App.4th at 1061, 124 Cal.Rptr.2d 818.

### C. Unjust Enrichment

Shum has also failed as a matter of law to prove the elements of unjust enrichment.

### 1. Preclusion by Express Contract

As a threshold matter, Defendants contend that Shum's unjust enrichment claim is precluded by the POL agreed to by the parties. This Court has already ruled that the POL and Shum's unjust enrichment claim cover different conduct. *See* Sept. 26, 2008 Order at 23:24–24:21. As a result, the POL does not preclude Shum's unjust enrichment claim.

### 2. Court or Jury as Fact Finder

 Defendants next contend that unjust enrichment is an equitable claim, and as such, the Court should find the facts on this claim instead of the jury. Shum disputes that unjust enrichment is an equitable claim. Under the Seventh Amendment, a party has a right to a jury trial on any equitable claim that shares

common issues of fact with a legal claim asserted by the party. *Shum v. Intel Corp.*, 499 F.3d 1272, 1279 (Fed.Cir.2007).

■ There is little doubt that unjust enrichment is an equitable claim. *See Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 570, 110 S.Ct. 1339, 108 L.Ed.2d 519 (1990). To be sure, in his Second Amended Complaint, Shum himself pled unjust enrichment "in equity." *See* Sec. Amend. Compl. ¶ 69. Shum may not retreat from that position now.

Nevertheless, Shum's unjust enrichment claim shares at least one common issue of fact with his breach of contract claim: whether or not Verdiell in fact believed that Shum was a co-inventor of the patented technology. As already discussed, in order to prove breach of contract, Shum must prove that Verdiell's patenting activities were unlawful. In order to do this, Shum must establish that Verdiell engaged in inequitable conduct before the PTO by deliberately omitting Shum even though he knew Shum was a co-inventor. Similarly, in order to prove unjust enrichment, Shum must demonstrate wrongful conduct on the part of Verdiell. *See County of San Bernardino*, 158 Cal.App.4th at 542–43, 69 Cal.Rptr.3d 848. In order to do this, Shum contends that Verdiell claimed false exclusivity as to his Radiance technology patents not only because he knew of Shum's rights under the POL but because he knew Shum was a co-inventor.

Accordingly, because Verdiell's state of mind regarding Shum's inventorship is a factual question common to both unjust enrichment and breach of contract, the unjust enrichment claim was properly tried to the jury.

### 3. Federal Preemption

■ In addition, Defendants contend that Shum's unjust enrichment claim is preempted by federal patent law. In a patent case, preemption occurs "whenever the state law provides patent-like protection to subject matter addressed by federal law." *See Dow Chem. Co. v. Exxon Corp.*, 139 F.3d 1470, 1473 (Fed.Cir.1998) (quotation omitted).

■ 35 U.S.C. § 262 provides, "In the absence of any agreement to the contrary, each of the joint owners of a patent may make, use, offer to sell, or sell the patented invention within the United States, or import the patented invention into the United States, without the consent of and without accounting to the other owners." Every co-inventor of a patent is presumptively a co-owner of an undivided pro-rata interest in the entire patent, regardless of his respective contribution to the development of the patented technology. *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1465 (Fed.Cir.1998). These ownership interests are separate and distinct. *Willingham v. Star Cutter Co.*, 555 F.2d 1340, 1344 (6th Cir.1977).

■ When one patent co-owner transfers his own interest in a patent to a third party, § 262 preempts any unjust enrichment claim brought by another co-owner seeking to disgorge a portion of the proceeds resulting from that transfer. *See, e.g., Tavory v. NTP, Inc.*, 297 Fed.Appx. 976, 982–83 (Fed.Cir.2008). Such unjust enrichment claims are preempted because they conflict with the purpose of § 262, which provides that a patent co-owner may transfer his own interest in a patent without the consent of, and without any accounting to, the other co-owners. *Id.*

Our case is distinguishable from *Tavory.* In this case, Shum does not seek compensation on the basis that Verdiell did in fact transfer Shum's own interests in the Radiance technology. Rather, the central premise of Shum's "false exclusivity" theory is that Intel bought LightLogic in reliance on Verdiell's misrepresentation that

he was the sole owner of the rights to the patents involved in the sale.

■ Section 262 does not speak to this alleged conduct. As noted above, patent co-owners' interests are separate and distinct. *Willingham*, 555 F.2d at 1344. As a result, the language in § 262 which empowers a patent co-owner to "make, use, offer to sell, or sell the patented invention . . . without the consent of and without accounting to the other owners" refers only to the interests of the transferring co-owner, not the interests of any other co-owner. Accordingly, Shum's unjust enrichment claim falls outside the scope of § 262, and there is no conflict with federal patent law.

#### 4. "Unjust" Retention of a Benefit

■ Shum has failed, however, to present any evidence from which a reasonable jury could conclude that Defendants' retention of any benefit was unjust.

#### a. Wrongful Conduct

First, Shum has failed as a matter of law to prove that Verdiell or LightLogic engaged in wrongful conduct. Shum contends that Defendants engaged in wrongful conduct by falsely claiming exclusive ownership of the Radiance technology. Shum's thesis is that Intel would not buy the patents unless it believed that Verdiell had exclusive rights to the patents. According to Shum, Verdiell also believed that there would be no sale unless he could transfer the entire rights in the patents to Intel, so Verdiell falsely claimed that he owned the entire rights to the patents in order to induce the sale. Shum argues that he presented a variety of evidentiary circumstances in support of this thesis at trial. Shum's evidence may be loosely grouped into three categories.

The first category consists of evidence which tends to prove that after executing the POL, Verdiell believed that he would have to have exclusive rights to the Radiance technology in order to obtain investment in LightLogic. *See, e.g.,* Trial Tr. vol. 5, 1000:19–1001:4, Nov. 20, 2008. The second category consists of evidence which tends to prove that Intel seeks to obtain "unique" and "proprietary" intellectual property in purchases such as that of LightLogic. *See, e.g.,* Trial. Ex. Nos. 740, 772, 2728.

The third category consists of three patent assignments which purported to transfer, from Verdiell to LightLogic, "exclusive right, title, and interest" to three patent applications. *See* Trial Ex. Nos. 15–17. The first assignment, filed with the PTO on May 12, 1998, transferred the rights to patent application number 09/003,114, the application which became the '567 patent. Trial Ex. No. 15. The second assignment, filed with the PTO on March 4, 1989, transferred the rights to patent application number 09/229,489, which became the '724 patent. Trial Ex. No. 16. The third assignment, filed with the PTO on April 28, 1989, transferred the rights to patent application number 09/229,395, which became the '950 patent. Trial Ex. No. 17.

The evidence contained in the first and second categories does not provide evidentiary support to Shum's thesis that Verdiell claimed false exclusivity. In order to prove false exclusivity, Shum must establish that Verdiell actually claimed exclusive rights to the technology at issue, and that Intel relied on that claim. At most, this evidence provides a motivational background for conduct by Verdiell or Intel, but it does not prove the conduct itself.

■ The patent assignments also fail to establish wrongful conduct. Since we know that both Shum and Verdiell have rights to the Radiance technology derived from the POL, Shum is correct that, on its face, the language "exclusive right, title, and interest" could suggest that Verdiell

was attempting to transfer Shum's rights to the Radiance technology. But that is a complete abstraction from the legal language used in the assignments. In the evidence actually introduced at trial, there is nothing to show that Verdiell intended to conceal Shum's POL-based rights in the Radiance technology, or that he attempted in any way to conceal those rights. To the contrary, all of the evidence at trial establishes that Verdiell and LightLogic fully disclosed Shum's rights under the POL to both Intel and LightLogic's venture capital investors. *See, e.g.,* Trial Tr. vol. 11, 2377:3–9, Dec. 3, 2008; *id.* vol. 14, 3047:20–3048:6, 3140:11–3141:21, 3192:17–3193:15, Dec. 9, 2008; *id.* vol. 15, 3346:5–14, Dec. 10, 2008. Lacking any evidence to the contrary, no reasonable juror could conclude that defendants Verdiell and LightLogic claimed "false exclusivity" as to the property rights to the Radiance technology.

#### b. Causation

 Even if Defendants had made a claim of false exclusivity, however, their enrichment in this case could not have been unjust unless the alleged claim of false exclusivity actually caused them to obtain a benefit.

Shum has presented no such evidence. At trial, Defendants presented numerous percipient witnesses from Intel and the LightLogic investors who possessed first-hand knowledge regarding their motivations for purchasing or investing in LightLogic. None of these witnesses testified that they believed Verdiell had exclusive rights in the Radiance technology, or that it made any difference to their decisions to invest in LightLogic. To the contrary, every percipient witness testified that they believed Verdiell had the right to use the Radiance technology under the POL, and that they also believed that exclusivity did not matter and that it was of no concern to them that Shum had co-equal rights under

the POL. *See, e.g.,* Trial Tr. vol. 10, 2160:17–2161:13, Dec. 2, 2008; *id.* vol. 11, 2377:3–9, Dec. 3, 2008; *id.* vol. 15, 3252:10–3253:14, Dec. 10, 2008. There was no testimonial or documentary evidence offered at trial that contradicts this testimony. There was an observation in Shum's papers that this testimony could be said to be "biased witness testimony." If this is an argument that the Intel or investor testimony in this case was false, the mildest response is that such an argument is incredulous. Shum has failed to establish that if Verdiell and LightLogic received a benefit, that it was caused by a claim of false exclusivity.

#### 5. Amount of Unjust Enrichment

 Finally, Shum has failed to prove the amount of Defendants' alleged unjust enrichment. In an unjust enrichment action, the plaintiff must introduce evidence substantiating the amount by which the defendants were allegedly unjustly enriched. *See Storage Tech. Corp. v. Cisco Sys., Inc.,* 395 F.3d 921, 928–29 (8th Cir.2005).

Shum seeks to recover to "all or half" of the $58.4 million that Verdiell obtained from the LightLogic–Intel merger, and to additionally recover approximately $175 million from LightLogic. *See* Trial. Tr. vol. 19, 3878:10–14, Dec. 17, 2008. In the aggregate, Shum asserts that he is entitled to roughly half of the $409 million LightLogic purchase price. Shum calculated Verdiell's alleged unjust enrichment based on the conclusory opinions of his experts that he is entitled to at least half of anything Verdiell acquired as a result of the Intel merger. Shum calculated LightLogic's alleged unjust enrichment by subtracting an assumed value of LightLogic's tangible assets and human resources, as well as the value of Verdiell's alleged unjust enrichment, from the $409 million In-

tel purchase price. Shum concludes that the remainder of the purchase price represents the value to Intel of Verdiell's patents on the Radiance technology.

Shum does not dispute that Verdiell spent approximately three and a half years building LightLogic, acquiring venture capital, assembling a management and engineering team, and overseeing the development and manufacture of LightLogic's transponder, as well as the contracts for the sale of these transponders to such Silicon Valley heavyweights as Cisco. All of these assets—human resources and the tangible and intangible property involved—were acquired by Intel when it purchased LightLogic. These assets were of obvious and significant value to Intel, and there is no question that this acquisition was a significant reason for the decision by Intel to purchase LightLogic. It should also be noted that the value of these assets is wholly independent of the value of the Verdiell patents which were purchased by Intel at the same time. From an unjust enrichment analysis standpoint, this also means that Intel paid Verdiell and LightLogic for both Radiance and non-Radiance assets, and that an unjust enrichment claim cannot be based on the value on the non-Radiance assets, as that is clearly not a benefit bestowed on Verdiell and LightLogic at the expense of Shum. Neither the sum of money paid by Intel to LightLogic or to Verdiell personally can be considered as an unjust enrichment benefit unless the total amount is apportioned between the value of the Radiance and non-Radiance assets. Shum's burden of proof on his unjust enrichment claim includes a burden to produce evidence in support of an appropriate apportionment. But Shum did not do so. There was no evidence offered as to the valuation of either the Radiance or the non-Radiance assets which could support a factual determination by the jury or provide a foundation for an expert opinion. The only apportionment numbers offered at the trial were from conclusory statements of the experts—they were not derived from or founded upon any evidence of the respective value of the assets.

Accordingly, Shum has failed to meet his burden of proof as to the amount of any claimed unjust enrichment.[2]

## D. Correction of Patent Inventorship

Last, the Court turns to Shum's claim for correction of patent inventorship. As noted, the jury returned verdicts on some patent claims but not on others.

### 1. Claims for Which the Jury Returned a Verdict

In order for the jury's verdicts to survive the instant motion, the verdicts need only be supported by "substantial evidence"—that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Fisher,* 558 F.3d at 1074. This standard requires considerable deference on the part of the Court, and the Court is prohibited from substituting its own view of the evidence for that of the jury. *Id.*

At trial, Shum presented evidence which established that he and Verdiell worked together in developing the Radiance technologies. Drawings, writings, and models related to both the DBC and the flexure patents, done by both Verdiell and Shum during their work at Radiance, were introduced as evidence to be considered by the jury. Shum was more skilled at producing computer aided (CAD) drawings, and most

**2.** Because the Court finds that Shum has failed to prove that any defendant was unjustly enriched, the Court need not reach Defendants' contention that LightLogic did not obtain a benefit as a result of the Intel acquisition.

of those produced were done by him. Of course, the fact that a person produces a drawing or model of a DBC or flexure related device does not establish that that person is the inventor of that device—that is a separate issue of fact. The jury was fully instructed on the patent law requirements for defining whether or not a person is an inventor and was told to look for the conception of the component elements of the patented invention as the touchstone of inventorship. The jury was not required to return detailed specific verdicts, but it was obvious that it fully considered all the evidence offered on the issue of conception in its verdicts which decided that Shum was a co-inventor of some claims of the patented inventions and not a co-inventor of others.

The jury returned verdicts that Shum was a co-inventor on five of the patents and that he was not the co-inventor of one of the patents. The Court finds no basis to usurp the fact finding function of the jury. The Court will deny Defendants' motion with respect to all claims on which the jury returned a verdict.

### 2. Claims for Which the Jury Failed to Return a Verdict

There are two remaining patent claims which stand in a much different procedural posture. Where there is a mistrial because the jury has failed to reach a verdict, the Court does not apply the deferential "substantial evidence" standard. Rather, the Court must independently assess whether Shum's evidence permits only one reasonable conclusion. *White*, 312 F.3d at 1010.

As to the '724 patent, the jury reached verdicts regarding claims 1, 7, 14, and 16, finding that Shum was a co-inventor of these claims. The jury did not reach a verdict as to claim 5.

Claim 1 of the '724 patent states:

A process for manufacturing an optoelectronic package comprising:

providing a substrate having a first optical element attached thereto;

applying pressure to a flexure causing legs on the flexure to spread further apart so that an optical axis of an optical fiber is in optical alignment with the first optical element; and then

coupling the flexure and the optical fiber to the substrate by attaching legs of the flexure to the substrate.

Claim 5 of the '724 patent is identical to claim 1 except as to the last clause, which describes "coupling the flexure . . . to the substrate." Claim 5 differs by stating:

coupling the flexure . . . to the substrate . . . wherein coupling the flexure comprises coupling a first pair of legs of the flexure to the substrate . . . and coupling a second pair of legs of the flexure to the substrate.

The difference in these claim terms is that claim 1 would permit the use of a single pair of legs for the flexure, but claim 5 is limited to a device using two pairs of legs. The jury reached a verdict on claim 1, finding that Shum was a co-inventor, but not on claim 5, which demonstrates that they were concerned with the question of whether or not Shum made the contribution of the second pair of legs in claim 5.

The Court has reviewed the evidence at trial on this issue. At trial, Shum's testimony referred to the '724 patent by showing the jury Trial Exhibit 122, which was his March 17, 1997 Record of Invention (ROI) of a "Lever Arm Pivot." Whether or not this exhibit has anything to do with legs of a flexure is a matter of significant debate, but there is no debate that it does not have any reference at all to a second pair of legs for a flexure. Shum also referred to Exhibit 163.008, a CAD drawing made by him on June 1, 1997. This drawing includes a depiction of a flexure

device with two pair of legs. The problem, however, is that this drawing is clearly not part of the moment of conception related to the inventive contribution of pairs of legs to be used on a flexure. It is clear that this invention had already taken place. The Exhibit is described as a drawing for the fabrication of a device which had already been conceived. There is nothing about this evidence that established anything more than a drawing by Shum of the pre-existing prior art—it does not establish any contribution of an inventive conception in claim 5 of the '724 patent. *See Nartron*, 558 F.3d at 1356–58. Shum's expert, Dr. Wayne Knox, also testified about the '724 patent, but his testimony did not add anything to Shum's testimony on the subject of a second pair of legs for the flexure.

On cross-examination, Shum was asked about a previous statement he had made about the '724 patent, when he had answered the question "Are you the sole inventor of the claims in this patent?" by stating, "I am." He explained that he was not trying to establish sole inventorship by this answer, but rather that he was explaining that as a sole inventor or as a co-inventor he had equal ownership rights to the technology.

In sum, Shum's evidence does not support any thesis that Shum had contributed the idea of a second pair of legs to the flexure described in claim 5 of the '724 patent. Shum has not met his burden of showing an inventive contribution to that claim.

As to the '427 patent, the jury reached verdicts as to claims 20, 22, and 23, finding that Shum was not a co-inventor of these claims. As to claim 1, the jury did not reach a verdict. Claim one states:

> A package comprising:
> a substrate having a floor;
> a first optical element coupled to the substrate;

a second optical element; and

a flexure coupled to the second optical element and the substrate to maintain the second optical element in optical alignment with the first optical element, the flexure including a body and a pair of front legs, the flexure also including a pair of rear legs that are attached to the substrate after the attachment of the front legs to the substrate, the attachment of the rear legs causing the flexure to move from a first flexure position to a second flexure position, the distance between the first flexure position and the second flexure position equaling an offset distance, the body of the flexure having a specified length chosen such that the offset distance causes a second offset distance of the second optical component held by the flexure which is within a specified range, the second offset distance equal to the distance between a primary second optical component position and a secondary second optical component position.

Here again, the Court finds no evidence of any contribution by Shum on the issue of the use of a second pair of legs in a more complex patent describing the use of a flexure to align optical components. Here again, Shum has failed to identify any evidence which would be sufficient to meet his burden of showing by clear and convincing evidence that he made an inventive contribution to claim 1 of the '427 patent.

Accordingly, the Court grants Defendants' motion with respect to both of the patent claims as to which the jury did not return a verdict.

### III. CONCLUSION

For the foregoing reasons, the Court finds:

1084

**Intentional Misrepresentation**

The defendants' motion for Judgment as a Matter of Law (JMOL) as to plaintiff's Intentional Misrepresentation claim is GRANTED and Judgment for the defendants is entered on this cause of action.

**Breach of Contract**

The defendants' motion for JMOL as to plaintiff's Breach of Contract claim is GRANTED and Judgment for the defendants is entered on this cause of action.

**Unjust Enrichment**

The defendants' motion for JMOL as to plaintiff's Unjust Enrichment claim is GRANTED and Judgment for the defendants is entered on this cause of action.

**Inventorship**

**U.S. Patent No. 5,977,567**

Pursuant to the verdict of the Jury, Judgment is entered that plaintiff Frank Shum is a co-inventor of claims 1, 6, 7, 8, 11 and 18.

**U.S. Patent No. 6,376,268**

Pursuant to the verdict of the Jury, Judgment is entered that plaintiff Frank Shum is a co-inventor of claims 1,4, 12, 13 and 26.

**U.S. Patent No. 6,207,950**

Pursuant to the verdict of the Jury, Judgment is entered that plaintiff Frank Shum is a co-inventor of claims 1, 2, 14 and 29.

**U.S. Patent No. 6,586,726**

Pursuant to the verdict of the Jury, Judgment is entered that plaintiff Frank Shum is a co-inventor of claims 1, 2, 5 and 8.

**U.S. Patent No. 6,227,724**

Pursuant to the verdict of the Jury, Judgment is entered that plaintiff Frank Shum is a co-inventor of claims 1, 7, 14 and 16; and

Defendants' motion for JMOL as to claim 5 of the '724 patent is GRANTED and Judgment is entered that plaintiff Frank Shum is not a co-inventor of claim 5.

**U.S. Patent No. 6,585,427**

Pursuant to the verdict of the Jury, Judgment is entered that plaintiff Frank Shum is not a co-inventor of claims 20, 22 and 23; and

Defendants' motion for JMOL as to claim 1 of the '427 patent is GRANTED and Judgment is entered that plaintiff Frank Shum is not a co-inventor of claim 1.

**U.S. Patent No. 6,252,726**

Plaintiff Frank Shum withdrew any claim based on this patent at the close of evidence.

IT IS SO ORDERED.